# EXHIBIT A

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT- LAW DIVISION**

| | | |
|---|---|---|
| **Izumi Saika and Mohammad Shakibai** | ) | 2018L004060 |
| | ) | CALENDAR/ROOM N |
| Plaintiffs, | ) | TIME 00:00 |
| | ) | Breach of Contract |
| v. | ) | |
| | ) | |
| **Ocwen Loan Servicing, LLC** | ) | **JURY DEMANDED** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs, Izumi Saika and Mohammad Shakibai, by their attorneys,

LAF, complains against Defendant Ocwen Loan Servicing, LLC ("Ocwen") for

breach of contract and violation of the Illinois Consumer Fraud and

Deceptive Business Practices Act.

### PARTIES

1.     Ms. Izumi Saika is sixty-two years old and is the co-owner of a

condominium located at 5445 N. Sheridan Road, Unit 808, in Chicago,

Illinois.

2.     Mr. Mohammad Shakibai is sixty-two years old and is the co-owner of

a condominium located at 5445 N. Sheridan Road, Unit 808, in Chicago,

Illinois.

3.     Defendant Ocwen Loan Servicing, LLC is a Delaware Limited Liability

Company that services mortgage loans. Its registered agent in Illinois is the

Illinois Corporation Service Company, located at 801 Adlai Stevenson Drive

in Springfield, Illinois.

1

## STATEMENT OF FACTS

4.     Ms. Saika and Mr. Shakibai are married and purchased their condominium located at 5445 N. Sheridan Road, Unit 808, Chicago, Illinois ("Home"), in 2007.

5.     Ms. Saika and Mr. Shakibai financed the purchase of their Home with a mortgage loan in the amount of $151,050. The principal and interest payment was $954.74 per month. The mortgage loan had a fixed interest rate of 6.5%.

6.     Ms. Saika and Mr. Shakibai signed the mortgage but only Ms. Saika is a borrower on the note.

7.     Indymac serviced Ms. Saika's mortgage loan account until 2013, when Ocwen began servicing the account.

8.     In 2014, Ms. Saika and Mr. Shakibai's monthly mortgage loan payments were $1,180.34, which included principal, interest, taxes, and insurance.

9.     When the loan was transferred to Ocwen, Ms. Saika and Mr. Shakibai set up and made the monthly mortgage payments by automatic debits from their bank account, bi-weekly. Ms. Saika authorized Ocwen to debit an additional $100 per month to pay toward the principal of the loan.

10.    Ocwen debited the amount of $690.17 bi-weekly, which resulted in extra funds of approximately $200 each month applying toward the principal of the loan.

2

11.    Then Ms. Saika was laid off from her employment.

12.    While Ms. Saika and Mr. Shakibai remained current on the monthly mortgage payments, Ms. Saika and Mr. Shakibai met with a HUD-certified housing counselor which assisted them in applying for assistance from the Illinois Hardest Hit Fund. Ms. Saika and Mr. Shakibai's application was successful and they received assistance from the Illinois Hardest Hit Fund.

13.    Ms. Saika and Mr. Shakibai also applied for a loan modification with Ocwen.

14.    On December 3, 2014, Ocwen sent Ms. Saika and Mr. Shakibai a loan modification offer Trial Period Plan ("TPP") under the Home Affordable Modification Program ("HAMP").

15.    Under the TPP agreement, Ms. Saika and Mr. Shakibai had to make four trial period payments of $627.62 per month by January 1, 2015, February 1, 2015, March 1, 2015, and April 1, 2015.

16.    In December of 2014, Ocwen also performed an escrow analysis on the account, which resulted in a reduction of Ms. Saika and Mr. Shakibai's regular monthly payment from $1,180.34 to $1,170.40.

17.    As a result of the payment reduction, Ocwen began automatically debiting the amount of $685.20 instead of $690.17 from Ms. Saika and Mr. Shakibai's account bi-weekly beginning on December 15, 2014. Ocwen automatically changed the monthly payment amount without a request from Ms. Saika and Mr. Shakibai.

18.    After receiving the TPP agreement, Ms. Saika and Mr. Shakibai contacted Ocwen by telephone and explained that they had an automatic debit payment on the account. Ms. Saika and Mr. Shakibai asked whether they needed to do anything in regard to making the trial period payment. The Ocwen representative told them that he did not need to do anything and the payment would be debited from the account.

19.    Ocwen continued to automatically debit the regular monthly mortgage payments from Ms. Saika and Mr. Shakibai's bank account, bi-weekly, however, rather than the monthly amount of $627.62 identified in the TPP agreement.

20.    As a result, Ms. Saika and Mr. Shakibai had paid their four trial period payments (as well as additional amounts) by automatic debit as follows:

       a.  $690.17 on December 8, 2014;

       b.  $685.20 on December 22, 2014;

       c.  $685.20 on January 5, 2015; and

       d.  $685.20 on January 20, 2015.

21.    On January 26, 2015, Ocwen sent Ms. Saika and Mr. Shakibai a letter congratulating them for being eligible for a "Home Affordable Modification."

22.    Ocwen enclosed a permanent "Modification Agreement" for Ms. Saika's signature which identified all of the terms of their new loan modification. A copy of the Modification Agreement is attached as Exhibit A.

23.     The Modification Agreement contained a new principal balance amount of $127,006.77.

24.     The Modification Agreement reduced the interest rate on the mortgage loan from 6.5% to 2% for the first five years. The interest rate adjusted after the fifth year but the maximum interest rate under the Modification Agreement was 3.625%. The mortgage loan's maturity date was also extended, from January 1, 2038 until June 1, 2051.

25.     The Modification Agreement took effect on May 1, 2015 and the monthly payment including principal, interest, taxes, and insurance was $627.02, of which $411.36 was principal and interest.

26.     Ms. Saika signed the Modification Agreement on February 9, 2015 and returned it to Ocwen.

27.     Although Ocwen offered Ms. Saika the Modification Agreement and she accepted it, Ocwen continued to automatically debit Ms. Saika and Mr. Shakibai's bank account bi-weekly in the amount of $685.20.

28.     Ms. Saika and Mr. Shakibai contacted Owen about stopped the automatic debit because Ocwen continued to automatically debit their bank account in the amount of the original mortgage payment.

29.     Ocwen representations told Ms. Saika and Mr. Shakibai that if they cancelled the automatic debit on the account, their loan would not be modified.

5

30.    Ocwen's automatic bi-weekly debits from Ms. Saika and Mr. Shakibai's bank account after offering the TPP caused Ms. Saika and Mr. Shakibai difficulty with paying their other bills.

31.    In April of 2015, Ocwen began holding Ms. Saika and Mr. Shakibai's bi-weekly payments in a suspense account rather than applying the payments to the amounts due.

32.    On April 21, 2015, Ocwen sent Ms. Saika and Mr. Shakibai a letter stating that their mortgage loan payment, in the amount of $1,170 was due and owing for April 1, 2015.

33.    On April 23, 2015, Owen sent Ms. Saika and Mr. Shakibai a delinquency notice, which stated that Ms. Saika and Mr. Shakibai were behind on their monthly payments as of February 2, 2015 in the amount of $-424.

34.    Ms. Saika and Mr. Shakibai received monthly statements and delinquency notices from Ocwen which were confusing and did not reflect the terms of the permanent Modification Agreement.

35.    Upon information and belief, Ocwen reported Ms. Saika's account as delinquent to credit reporting agencies although she had made all of her payments on time or early.

36.    From April of 2015 through August of 2016, Ms. Saika and Mr. Shakibai repeatedly wrote Ocwen about their Modification Agreement, the

confusing and erroneous monthly statements, and the delinquency notices they received.

37.    Ocwen responded to Ms. Saika and Mr. Shakibai in writing with confusing and convoluted letters, which contained typographical and numerical errors.

38.    Ocwen, consistently, however, affirmed and ratified the terms of the Modification Agreement and assured Ms. Saika and Mr. Shakibai that it was working to update their account to reflect the terms of the Modification Agreement.

39.    Effective June 1, 2015, Ocwen changed the regular monthly mortgage payment from $1,170.40 to $1,164.93, due to changes in the escrow account.

40.    Although Ms. Saika had a permanent loan modification, Ocwen representatives told Ms. Saika and Mr. Shakibai to continue to making the original mortgage payment amount and that if Ms. Saika and Mr. Shakibai stopped the payment by automatic debit from their bank account, the loan would not be modified.

41.    On October 13, 2015, Ocwen sent two letters to Ms. Saika and Mr. Shakibai.

42.    In the first letter, Ocwen stated that Ms. Saika was not eligible for a loan modification because the "loan had been reinstated and you no longer appear to be in need of modification."

7

43.    In the second letter, Ocwen informed Ms. Saika and Mr. Shakibai that Ocwen had transferred the servicing of the mortgage loan to Nationstar Mortgage, LLC ("Nationstar") as of November 1, 2015.

44.    On October 23, 2015, Ocwen sent Ms. Saika and Mr. Shakibai another delinquency notice stating the account was delinquent since February 2, 2015 and listing the following payments:

      a.  10/1/2015- unpaid amount of $1,164.93

      b.  9/1/2015- unpaid amount of $1,164.93

      c.  8/1/2015- unpaid amount of $1,164.93

      d.  7/1/2015- unpaid amount of $1,164.93

      e.  6/1/2015- unpaid amount of $1,164.93

      f.  5/1/2015- unpaid amount of $1,170.4

45.    Despite listing six months of payments unpaid, the total delinquency listed on the delinquency notice is $1,173.4. It also states the total amount due includes the next regular monthly payment.

46.    Ms. Saika and Mr. Shakibai again wrote to Ocwen for an explanation.

47.    On December 4, 2015, Ocwen sent a letter to Ms. Saika and Mr. Shakibai stating that "[a]s the account remained current or in good standing during and after the TPP, Ocwen was unable to complete the permanent modification of the account with the investor of the loan, the Federal National Mortgage Association (Fannie Mae)."

8

48.     The letter further states "[p]lease note in order to complete the modification process Fannie Mae requires the loan have a delinquency. The primary directive that affects your account is the definition of good standing. Investor guidelines state, as long as the loan is in good standing, no other payment assistance may be considered. Good standing is defined as less than a full three (3) full month delinquency."

49.     The letter further explains "[i]n order to reclassify the loan, on April 21, 2015, the regular monthly payments that were applied to the account from February 1, 2015 to April 21, 2015, were reversed from the loan and moved into a suspense account. As a result, the loan reflected a three-month delinquency for the February, March, and April contractual installments."

50.     The letter also says "[a]s Ocwen was diligently working with Fannie Mae to finalize the modification, all funds received from April 21, 2015, through June 1, 2015, were applied towards the suspense account. However, on June 12, 2015 the funds in the amount of $7,029.71 held in the suspense account were reversed and re-applied as a reinstatement. On August 28, 2015, and September 23, 2015, Ocwen submitted requests to Fannie Mae to reclassify the loan was rejected [sic], as Fannie Mae advised the loan was not eligible since again the account was current."

51.     Finally, the letter states "[s]ubsequently on October 9, 2015, the modification was denied, as the loan was reinstated and current, and you no

longer appear to be in need of a modification. The denial letter was sent to your attention on October 13, 2015. However, in an attempt to correct the account on October 15, 2015, funds in the amount of $10,444.79, which represented all payments going back to February 1, 2015, were again reversed from the account and applied towards the suspense account. Unfortunately, we were unable to complete this process prior to the servicing rights of the loan transferring on November 1, 2015."

52.    Ms. Saika and Mr. Shakibai continued to correspond with Ocwen but Ocwen repeatedly stated that the servicing of the account had been transferred to Nationstar and there was nothing more Ocwen could do in regards to their account.

53.    Ms. Saika and Mr. Shakibai attempted to work with Nationstar to reach a resolution.

54.    Ms. Saika and Mr. Shakibai re-applied for a loan modification with Nationstar.

55.    Ms. Saika and Mr. Shakibai were, at first, unable to obtain a loan modification with Nationstar.

56.    On October 5, 2016, Nationstar filed a foreclosure action against Ms. Saika and Mr. Shakibai in the Circuit Court of Cook County, case number 16 CH 13156.

57.    Ms. Saika and Mr. Shakibai incurred expenses in hiring a lawyer to represent them in the foreclosure case.

58.    Ms. Saika and Mr. Shakibai also incurred expenses when their condominium association, which was also named as a defendant in the foreclosure case, hired an attorney to represent it.

59.    On May 2, 2017, a default judgment was entered against Ms. Saika and Mr. Shakibai.

60.    Ms. Saika and Mr. Shakibai's home was schedule for foreclosure sale in August of 2017.

61.    On August 1, 2017, Ms. Saika filed a chapter 13 bankruptcy petition.

62.    Ms. Saika and Mr. Shakibai incurred costs in filing the bankruptcy petition.

63.    Ms. Saika and Mr. Shakibai also incurred costs consulting with bankruptcy attorneys, although Ms. Saika ultimately filed her bankruptcy case *pro se*.

64.    After filing the bankruptcy case, Ms. Saika and Mr. Shakibai received a Trial Period Plan from Nationstar for a new loan modification.

65.    Ms. Saika and Mr. Shakibai completed the Trial Period Plan and received a new permanent loan modification agreement from Nationstar, effective November 1, 2017.

66.    The new loan modification agreement with Nationstar provided for an unpaid principal balance of $146,848.34, to be repaid at 4% interest, with monthly payments of $613.74 in principal and interest.

67.    The new loan modification agreement extended the maturity date on the mortgage loan to November 1, 2057.

68.    The principal balance and interest rate are higher on Ms. Saika's new loan modification with Nationstar than on the Modification Agreement Ocwen offered her.

69.    Ms. Saika's bankruptcy case was dismissed on September 5, 2017.

### COUNT I - BREACH OF CONTRACT

70.    Plaintiff incorporates Paragraphs 1-69 above by reference herein.

71.    Ocwen offered Ms. Saika a permanent "Modification Agreement." See Ex. A.

72.    Ms. Saika accepted the Modification Agreement by signing the agreement and returning the agreement to Ocwen.

73.    Ocwen received the Modification Agreement signed by Ms. Saika.

74.    Ocwen breached the Modification Agreement with Ms. Saika by refusing to honor the terms of the Modification Agreement.

75.    Ms. Saika and Mr. Shakibai incurred costs as a result of Ocwen's breach of the Modification Agreement.

76.    Ms. Saika's new loan modification with Nationstar does not contain terms as favorable as the Modification Agreement she had with Ocwen.

WHEREFORE, Plaintiffs pray for Judgment in their favor and against Defendant Ocwen and for the following relief:

A.     Actual damages in the amount of at least $56,000, which

represents the present value of the cost difference between the

Modification Agreement offered by Ocwen and the modification

Plaintiffs obtained from Nationstar in 2017; and costs and

expenses Plaintiff incurred, as well as other damages resulting

from defendant's failure to perform.

B.     For such other and further relief as the Court determines is

equitable and just.

## COUNT II –VIOLATION OF THE CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

77.     Plaintiff incorporates Paragraphs 1-69 above by reference herein.

78.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") provides that:

> "Unfair methods of competition and unfair or
> deceptive acts or practices, including but not limited
> to the use or employment of any deception fraud,
> false pretense, false promise, misrepresentation or
> the concealment, suppression or omission of any
> material fact, with intent that others rely upon the
> concealment, suppression or omission of such
> material fact, or the use or employment of any
> practice described in Section 2 of the "Uniform
> Deceptive Trade Practices Act", approved August 5,
> 1965, in the conduct of any trade or commerce are
> hereby declared unlawful whether any person has in
> fact been misled, deceived or damaged thereby. In
> construing this section consideration shall be given
> to the interpretations of the Federal Trade
> Commission and the federal courts relating to
> Section 5 (a) of the Federal Trade Commission Act."

13

810 ILCS 505/2.

79.   Ocwen offered Ms. Saika a Modification Agreement which Ms. Saika accepted in February of 2015.

82.   Ocwen engaged in an unfair practice by refusing to honor the Modification Agreement after Ms. Saika accepted the agreement.

80.   Ocwen engaged in an unfair practice by waiting until October of 2015 to notify Ms. Saika that it had determined she was not eligible for a loan modification.

81.   Ocwen engaged in an unfair practice by automatically debiting regular monthly mortgage payments from Ms. Saika and Mr. Shakibai's account after offering them a TPP.

82.   Ocwen engaged in an unfair practice by placing Ms. Saika and Mr. Shakibai's payments in a suspense account rather than applying them to monthly payments that had come due.

83.   Upon information and belief, Ocwen engaged in an unfair practice by reporting Ms. Saika to credit reporting agencies as delinquent on mortgage loan payments when she was current.

84.   Ocwen engaged in an unfair practice by instructing Ms. Saika and Mr. Shakibai to make full monthly mortgage payments and then refusing to honor the Modification Agreement because the mortgage loan was current.

14

85.    Ocwen's correspondence with Ms. Saika and Mr. Shakibai was confusing and upsetting to Ms. Saika and Mr. Shakibai, who feared they would lose their home.

86.    Ocwen's correspondence with Ms. Saika and Mr. Shakibai negatively affected their mental health, causing them much stress and worry.

WHEREFORE, Plaintiffs pray for Judgment in their favor and against Defendant, and for the following relief:

       A.  Actual damages, including aggravation and inconvenience;

       B.  Punitive damages in an amount to be determined by a jury;

       C.  Costs of suit;

       D.  Attorney's fees; and

       E.  For such other relief as the Court determines is equitable and just.

Respectfully submitted,

Kari Beyer

Michelle A. Weinberg
Kari Beyer
Attorneys for Plaintiffs
LAF
120 S. LaSalle
Chicago, Illinois 60603
(312) 347-8363 (MAW)
(312) 229-6382 (KB)
mweinberg@lafchicago.org
kbeyer@lafchicago.org
Attorney No. 91017

███3219                                                            -HMP-
Investor Loan # _____
After Recording Return To:

_____
_____
_____
This document was prepared by _____
_____[Space Above This Line For Recording Data]_____

### HOME AFFORDABLE MODIFICATION AGREEMENT

## (Step Two of Two–Step Documentation Process)

Borrower(s) ("I"): *Izumi Saika*

Servicer ("Servicer"): *Ocwen Loan Servicing, LLC*

Date of first lien Security Instrument ("Mortgage") and Note ("Note"): *12/21/2007*

Loan Number: ███3219

Property Address: 5445 N Sheridan Rd 808 Chicago, IL 60640 ("Property")

If my representations in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Servicer, the Servicer will send me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1.    **My Representations.** I certify, represent to Servicer and agree:

    A.   I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

    B.   I live in the Property as my principal residence, and the Property has not been condemned;

    C.   There has been no change in the ownership of the Property since I signed the Loan Documents;

    D.   I have provided documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification program ("Program"));

    E.   Under penalty of perjury, all documents and information I have provided to Servicer in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

    F.   If Servicer requires me to obtain credit counseling in connection with the Program, I will do so;

    G.   I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan; and

*HMP_Tier1_v2.0*
260123
*NMLS # 1852*



■■■■3219                                                                                      -HMP-

2. **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

   A. TIME IS OF THE ESSENCE under this Agreement;

   B. If prior to the Modification Effective Date as set forth in Section 3 the Servicer determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate. In this event, the Servicer will have all of the rights and remedies provided by the Loan Documents; and

   C. I understand that the Loan Documents will not be modified unless and until (i) I receive from the Servicer a copy of this Agreement signed by the Servicer, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Servicer will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3. **The Modification.** If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on 5/1/2015 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. The Loan Documents will be modified and the first modified payment will be due on 5/1/2015.

   A. The new Maturity Date will be; 6/1/2051, at which time a final balloon payment in an amount equal to all remaining amounts owed under the Loan Documents will be due.

   B. The modified Principal balance of my Note will include all amounts and arrearages that will be past due (excluding unpaid late charges) less any amounts paid to the Servicer but not previously credited to my Loan. The new Principal balance of my Note will be $127,006.77 (the "New Principal Balance").

   C. Interest at the rate of 2.00000% will begin to accrue on the New Principal Balance as of 4/1/2015 and the first new monthly payment on the New Principal Balance will be due on 5/1/2015. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1-5 | 2.00000% | 4/1/2015 | $411.36 | $215.66, adjusts annually after year 1 | $627.02, adjusts annually after year 1 | 5/1/2015 | 60 |
| 6 | 3.00000% | 4/1/2020 | $471.28 | Adjusts Annually | Adjusts Annually | 5/1/2020 | 12 |
| 7-Loans Maturity | 3.62500% | 4/1/2021 | $509.96 | Adjusts Annually | Adjusts Annually | 5/1/2021 | 362 |
| . | . | . | . | . | . | . | . |
| . | . | . | . | . | . | . | . |

   *The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

   The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step or simple interest rate.

   D. I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

   E. If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

   F. I agree to pay in full (1) the Deferred Principal Balance (deferred principal balance will be treated as a non-interest bearing principal forbearance. I will not pay interest or make monthly payments on the deferred principal balance.), if any, and (2) any other amounts still owed under the Loan Documents, by the earliest of: (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance (The new principal balance less the deferred principal balance shall be referred to as the "interest bearing principal balance), or (iii) the new Maturity Date.

HMP_Tier1_v2.0
260123
NMLS # 1852

7196263219                                                                                                    -HMP-

4.   **Additional Agreements.** I agree to the following:

   A.   That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless a borrower or co-borrower is deceased or the Servicer has waived this requirement in writing.

   B.   That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or Workout Plan that I previously entered into with Servicer.

   C.   To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

   D.   Funds for Escrow Items. I will pay to Servicer on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Servicer under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Servicer in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Servicer requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Servicer all notices of amounts to be paid under this Section 4.D. I shall pay Servicer the Funds for Escrow Items unless Servicer waives my obligation to pay the Funds for any or all Escrow Items.

   Servicer may waive my obligation to pay to Servicer Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Servicer and, if Servicer requires, shall furnish to Servicer receipts evidencing such payment within such time period as Servicer may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Servicer may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Servicer any such amount. Servicer may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Servicer all Funds, and in such amounts, that are then required under this Section 4.D.

   Servicer may, at any time, collect and hold Funds in an amount (a) sufficient to permit Servicer to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a Servicer can require under RESPA. Servicer shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

   The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Servicer, if Servicer is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Servicer shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Servicer shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Servicer pays me interest on the Funds and applicable law permits Servicer to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Servicer shall not be required to pay me any interest or earnings on the Funds. Servicer and I can agree in writing, however, that interest shall be paid on the Funds. Servicer shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

   If there is a surplus of Funds held in escrow, as defined under RESPA, Servicer shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Servicer shall notify me as required by RESPA, and I shall pay to Servicer the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Servicer shall notify me as required by RESPA, and I shall pay to Servicer the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

*HMP_Tier1_v2.0*
260123
*NMLS # 1852*

█████3219                                                                                      -HMP-

Upon payment in full of all sums secured by the Loan Documents, Servicer shall promptly refund to me any Funds held by Servicer.

E.   That this Agreement constitutes notice that the Servicer's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my Escrow Account.

F.   That the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

G.   That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Servicer and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

H.   That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without Servicer's prior written consent, Servicer may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Servicer shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer. If Servicer exercises this option, Servicer shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Servicer may invoke any remedies permitted by the Mortgage without further notice or demand on me.

I.   That, as of the Modification Effective Date, a buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan. This Agreement may not, under any circumstances, be assigned to, or assumed by, a buyer of the Property.

J.   If under the Servicer's procedures a title endorsement or subordination agreements are required to ensure that the modified mortgage Loan retains its first lien position and is fully enforceable, I understand and agree that the Servicer will not be obligated or bound to make any modification of the Loan Documents or to execute the Modification Agreement if the Servicer has not received an acceptable title endorsement and/or subordination agreements from other lien holders, as Servicer determines necessary.

K.   That, as of the Modification Effective Date, any provision in the Note, as amended, for the assessment of a penalty for full or partial prepayment of the Note is null and void.

L.   Corrections and Omissions. You agree to execute such other and further documents as may be reasonably necessary to consummate the transactions contemplated herein or to perfect the liens and security interests intended to secure the payment of the loan evidenced by the Note. If an error in the terms hereof is detected after execution of this Agreement, you understand that a corrected Agreement will be provided to you and this Agreement will be void upon notice of such error. Should you elect not to sign any such corrected Agreement, your loan will revert to the terms of your original Loan Documents.

M.   Mortgage Electronic Registration Systems, Inc. "MERS" is a separate corporation existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026 Flint, MI 48501-2026, (888) 679-MERS. In cases where the Loan has been registered (solely as nominee for lender and lender's successors and assigns) with MERS and MERS is named as mortgagee in the Loan Documents, MERS, if necessary to comply with law or custom, has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Servicer including, but not limited to, releasing and canceling the mortgage loan.

N.   That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

HMP_Tier1_v2.0
260123
NMLS # 1852

▬3219                                                                         -HMP-

[ ]   *If this box is checked, Borrower(s) signature must be notarized.*

In Witness Whereof, the Servicer and I have executed this Agreement.

Sign Here→   ___Izumi Saeka___ 02,09,2015  Date

State of Illinois)

County of _____ )

On _____ before me, _____ personally appeared
_____, who proved to me on the basis of satisfactory evidence to be
the person(s) whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in
his/her authorized capacity, and that by his/her signature(s) on the instrument the person, or the entity upon behalf of which the
person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Illinois that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____ (Seal)

Print Name: _____

Commission expiration date___/___/_____

Personally Known_____ OR Produced Identification_____

Type of Identification Produced_____

_____

Sign Here→   ___Izumi Saeka___ 02,09,2015  Date

State of Illinois)

County of _____ )

On _____ before me, _____ personally appeared
_____, who proved to me on the basis of satisfactory evidence to be
the person(s) whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in
his/her authorized capacity, and that by his/her signature(s) on the instrument the person, or the entity upon behalf of which the
person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Illinois that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____ (Seal)

Print Name: _____

Commission expiration date___/___/_____

Personally Known_____ OR Produced Identification_____

Type of Identification Produced_____

HMP_Tier1_v2.0
260123
NMLS # 1852

7196263219                                                                                          -HMP-

*All individuals on the title (even if not a borrower on the note) must sign this agreement. If there are more than two title holders to this property, please have them sign below. If no other title holders exist, please leave page 6 blank and return it with the rest of the agreement.

In Witness Whereof, the Servicer and I have executed this Agreement.

Sign Here→ _____ 02.09.2014 Date

State of Illinois)

County of _____ )

On _____ before   me,   _____ personally   appeared
_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature(s) on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Illinois that the foregoing paragraph is true and correct. WITNESS my hand and official seal.

Signature _____ (Seal)

Print Name: _____

Commission expiration date____/____/_____ .

Personally Known_____ OR Produced Identification_____

Type of Identification Produced_____

_____

Sign Here→ _____      _____/____/_____   Date

State of Illinois)

County of _____ )

On _____ before   me,   _____ personally   appeared
_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature(s) on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Illinois that the foregoing paragraph is true and correct. WITNESS my hand and official seal.

Signature _____ (Seal)

Print Name: _____

Commission expiration date____/____/_____

Personally Known_____ OR Produced Identification_____

Type of Identification Produced_____

_____

Servicer _____          BY _____

Date _____
If applicable: _____
          Mortgage Electronic Registration Systems, Inc. – Nominee for Servicer

Page 6 of 6

HMP_Tier1_v2.0
260123
NMLS # 1852