UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IZUMI SAIKA and MOHAMMAD SHAKIBAI, | ) | |
| | ) | |
| Plaintiffs, | ) | 18 C 3888 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| OCWEN LOAN SERVICING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## M<small>EMORANDUM</small> O<small>PINION AND</small> O<small>RDER</small>

Izumi Saika and her husband, Mohammad Shakibai, brought this suit in the Circuit Court

of Cook County, Illinois, alleging that their mortgage loan servicer, Ocwen Loan Servicing,

LLC, breached an agreement to modify their loan and violated the Illinois Consumer Fraud and

Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. ("ICFA").  Doc. 1-1.  Ocwen removed

the suit under the diversity jurisdiction, Doc. 1, and now moves under Civil Rule 12(b)(6) to

dismiss the complaint, Doc. 10.  The motion is granted as to the contract claim and denied as to

the ICFA claim, though Plaintiffs will be allowed to replead the contract claim.

### Background

In resolving a Rule 12(b)(6) motion, the court must accept the operative complaint's

well-pleaded factual allegations, with all reasonable inferences drawn in Plaintiffs' favor, but not

its legal conclusions.  *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir.

2016).  The court must also consider "documents attached to the complaint, documents that are

critical to the complaint and referred to in it, and information that is subject to proper judicial

notice," along with additional facts set forth in Plaintiffs' brief opposing dismissal, so long as

those additional facts "are consistent with the pleadings."  *Phillips v. Prudential Ins. Co. of Am.*,

714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Plaintiffs as those materials permit. *See Domanus v. Locke Lord, LLP*, 847 F.3d 469, 479 (7th Cir. 2017). In setting forth the facts at this stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

A.      **The Home Affordable Modification Program**

The U.S. Treasury Department established the Home Affordable Modification Program ("HAMP") in 2009 to encourage home mortgage loan modifications designed to help homeowners avoid foreclosure. *See Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 228 (1st Cir. 2013) ("HAMP urges banks and loan servicers to offer loan modifications to eligible borrowers with the goal of reducing their mortgage payments to sustainable levels … .") (internal quotation marks and alteration omitted). Mortgage loan servicers like Ocwen could participate in the HAMP by executing a servicer participation agreement with Fannie Mae (Treasury's designated agent) and following HAMP guidelines. *See* U.S. Dep't of Treasury, Supp. Dir. 09-01, at 1 (Apr. 9, 2009), https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd0901.pdf; *see also Young*, 717 F.3d at 228-29 (describing the relationship between Treasury, Fannie Mae, and mortgage loan servicers); Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages 17 (Mar. 3, 2014), https://www.hmpadmin.com/portal/programs/docs/hamp_servicer /mhahandbook_44.pdf (compiling HAMP guidelines for loans not owned or guaranteed by government-sponsored entities like Fannie Mae). If the mortgage loan was owned or guaranteed by Fannie Mae, then the servicer was required to follow the parallel HAMP guidelines issued by Fannie Mae. *See Markle v. HSBC Mortg. Corp. (USA)*, 844 F. Supp. 2d 172, 176-77 (D. Mass. 2012) ("[Fannie Mae's Servicing Guide] requires servicers of mortgage notes owned by Fannie

Mae to participate in HAMP and abide by HAMP directives and guidelines.").  Plaintiffs assert that Fannie Mae's HAMP guidelines apply to their loan, Doc. 19 at 14-15; Doc. 19-2 (reproducing Fannie Mae, Servicing Guide: Fannie Mae Single Family 450-459 (Nov. 12, 2014), https://www.fanniemae.com/content/guide/svc111214.pdf), and Ocwen does not dispute that assertion, Doc. 21; Doc. 1-1 at ¶ 47 (Ocwen describing Fannie Mae as "the investor of [Plaintiffs'] loan"), so the court will treat the Fannie Mae HAMP guidelines as authoritative.

HAMP guidelines set forth eligibility criteria for borrowers seeking a mortgage loan modification.  *See* Fannie Mae, *supra*, at 451; Making Home Affordable Program, *supra*, at 72-73.  Under the guidelines in effect during the relevant time frame, a mortgage loan was potentially eligible for a HAMP modification if it was "delinquent" or in "imminent default." Fannie Mae, *supra*, at 394, 451; *see also* Making Home Affordable Program, *supra*, at 73 (providing that a loan was HAMP-eligible if "[t]he mortgage loan is delinquent or default is reasonably foreseeable").  If a servicer determined that a mortgage loan was eligible for a HAMP modification, various features of the loan would be adjusted to make the borrower's monthly payments more affordable, reducing the likelihood of default and foreclosure.  *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556-57 & n.1 (7th Cir. 2012) (describing the method used to modify loan terms); Fannie Mae, *supra*, at 452 (same).

If the loan servicer found a borrower qualified for a HAMP modification, the servicer would implement a Trial Period Plan ("TPP") before offering a permanent modification.  *See Wigod*, 673 F.3d at 557; Fannie Mae, *supra*, at 454 ("Prior to granting a permanent [HAMP] mortgage loan modification, the servicer must place the borrower in a [TPP] using the new modified loan terms.").  If "the servicer … determined that the borrower's monthly payment [was] in imminent default," the TPP would last four months, during which time the monthly

payment had to "be less than the contractual monthly payment in effect prior to the [TPP]." Fannie Mae, *supra*, at 456. If a borrower successfully completed the TPP and submitted "all other required documentation, … including a fully executed Modification Agreement," she then could receive a permanent modification. Making Home Affordable Program, *supra*, at 130; *see also* Fannie Mae, *supra*, at 456.

**B.     Ocwen's Handling of Plaintiffs' HAMP Application**

In 2007, Plaintiffs financed their joint purchase of a condominium with a thirty-year $151,050 note secured by a mortgage. Doc. 1-1 at ¶¶ 4-5, 24; Doc. 11-1 at 2-3. Although both Plaintiffs were on the title and signed the mortgage agreement, only Saika signed the note. Doc. 1-1 at ¶¶ 1-2, 6; Doc. 11-1 at 2, 14. In 2013, Ocwen became Plaintiffs' loan servicer. Doc. 1-1 at ¶ 7. Plaintiffs authorized Ocwen to automatically debit their bank account $690.17 every two weeks, which resulted in payments some $200.00 more per month than their monthly mortgage obligation, then $1,180.34. *Id.* at ¶¶ 8, 10.

After Saika was laid off in 2014, she and Shakibai applied to Ocwen for a loan modification. Doc. 1-1 at ¶¶ 11, 13. On December 3, 2014, Ocwen sent Plaintiffs a TPP agreement, which required them to make four monthly trial period payments of $627.62 in January, February, March, and April 2015. *Id.* at ¶¶ 14-15. Because the monthly TPP payments were much less than their existing mortgage payments, Plaintiffs asked Ocwen about the automatic biweekly $690.17 debit. *Id.* at ¶ 18. Ocwen responded that Plaintiffs did not need to do anything for the automatic debit to be changed to reflect the TPP payment amount. *Ibid*; Doc. 19 at 2. But instead of adjusting the automatic debit to reflect the TPP payment amount, Ocwen debited $690.17 on December 8, 2014, and then $685.20 (changed to reflect an escrow adjustment that reduced the pre-TPP monthly payment to $1,170.40) every two weeks thereafter.

Doc. 1-1 at ¶¶ 16, 19-20. As a result, Plaintiffs paid the entire amount required by the TPP (and then some) by January 20, 2015; despite this, the biweekly $685.20 debits continued throughout (and beyond) the four-month TPP period. *Id*. at ¶¶ 15, 20, 27. Indeed, Plaintiffs remained current on their pre-TPP monthly mortgage payments throughout the modification process. *Id*. at ¶ 12.

On January 26, 2015, Ocwen informed Plaintiffs that they were eligible for a "Home Affordable Modification." Doc. 1-1 at ¶ 21. Enclosed with Ocwen's letter was a "Modification Agreement" addressed only to Saika. *Id*. at ¶ 22; *see id*. at p. 17 (listing only Saika as a "Borrower"). The Modification Agreement contemplated several adjustments to the loan: the principal balance would become $127,006.77; the interest rate would fall from 6.5% to 2% until April 2020 and thereafter would not exceed 3.625%; the maturity date was extended to June 1, 2051; and the monthly payment, effective May 1, 2015, would be $627.02. *Id*. at ¶¶ 23-25; *id*. at p. 18. The Modification Agreement required all persons on the title or the Loan Documents—a term defined to include the mortgage agreement and the note, *id*. at p. 17—to sign and return the Agreement, and provided that Ocwen would not be bound to the Agreement if that requirement was not satisfied. *Id*. at pp. 17-19, 22. The Agreement further provided that the loan would not be modified until Saika received a copy countersigned by Ocwen. *Id*. at p. 18.

Saika returned the Modification Agreement to Ocwen on February 9, 2015 with only her signature, and Ocwen never countersigned. Doc. 1-1 at ¶¶ 26, 42; *id*. at pp. 21-22. Instead, Ocwen continued to automatically debit $685.20 biweekly from Plaintiffs' bank account. *Id*. at ¶ 27. When Plaintiffs inquired about halting the automatic debit, Ocwen responded that doing so would prevent approval of the loan modification and instructed them to keep the debit in place. *Id*. at ¶¶ 28-29, 40. In April 2015, without notifying Plaintiffs, Ocwen began placing their

mortgage payments in a suspense account rather than crediting them toward the loan balance. *Id.* at ¶¶ 31, 49. Under the mortgage agreement, Ocwen could hold payments in a suspense account only if the payments were "insufficient to bring the loan current." Doc. 11-1 at 5.

In late April 2015, even though Plaintiffs remained current on their loan payments, Ocwen sent Plaintiffs a delinquency notice and a letter informing them that their April 2015 loan payment was outstanding. Doc. 1-1 at ¶¶ 32-33. Ocwen continued to send Plaintiffs monthly statements and delinquency notices that did not reflect the modified loan terms or Plaintiffs' automatic payments. *Id.* at ¶¶ 34-35. Ocwen also represented the loan as delinquent to credit reporting agencies. *Id.* at ¶ 35.

In addition to inquiring about the automatic debit, Plaintiffs repeatedly wrote Ocwen to ask about the status of their account and of the loan modification. Doc. 1-1 at ¶ 36. Ocwen assured Plaintiffs that it was working to update their account to reflect the terms of the Modification Agreement. *Id.* at ¶ 38. But on October 13, 2015, Ocwen sent Plaintiffs a letter denying the modification on the grounds that the "loan had been reinstated" and that therefore they no longer "appear[ed] to be in need of modification." *Id.* at ¶¶ 41-42. Following Plaintiffs' request for further information, Ocwen wrote on December 4, 2015 that because "the account remained current or in good standing during and after the TPP, Ocwen was unable to complete the permanent modification of the account with [Fannie Mae]." *Id.* at ¶¶ 46-47. According to Ocwen, Fannie Mae did not allow modification of mortgage loans with "less than a full three (3) full [*sic*] month delinquency." *Id.* at ¶ 48. Although Ocwen initially held mortgage payments made after January 2015 in a suspense account, making the account appear delinquent, on June 12, 2015 it applied the balance of the suspense account, $7,029.71, to bring the loan current, which (according to Ocwen) led Fannie Mae to deny modification because the account appeared

current. *Id*. at ¶¶ 49-51. Ocwen notified Plaintiffs in a second October 13, 2015 letter that, effective November 1, 2015, it would transfer servicing of the loan to Nationstar Mortgage, LLC. *Id*. at ¶¶ 41, 43.

Despite having told Plaintiffs on October 13, 2015 that their loan had been reinstated, Ocwen sent Plaintiffs a delinquency notice October 23, 2015 describing the account as delinquent since February 2, 2015. *Id*. at ¶¶ 42, 44-45. The notice listed $1,170.40 owing for May 2015 and $1,164.93—which had become Plaintiffs' monthly payment following another escrow adjustment effective June 1, 2015—owing for each month from June through October 2015. *Id*. at ¶¶ 39, 44. In December 2015, Ocwen admitted to Plaintiffs that on October 15, 2015, it moved all payments they made since February 1, 2015, totaling $10,444.79, from the loan account to a suspense account, but stated that it could no longer make any adjustments to the account because servicing rights had been transferred to Nationstar. *Id*. at ¶¶ 47, 51-52.

Despite Plaintiffs' efforts to resolve their delinquency and pursue a loan modification, Nationstar brought a foreclosure suit in October 2016. Doc. 1-1 at ¶¶ 53-56; Doc. 11-2. A default judgment of foreclosure and sale was entered in May 2017. Doc. 1-1 at ¶ 59; Doc. 19-1 at ¶ 2. After Plaintiffs' unsuccessful attempt to vacate the default, Saika filed for bankruptcy and Plaintiffs ultimately entered into a TPP and loan modification agreement (effective November 1, 2017) with Nationstar. Doc. 1-1 at ¶¶ 61, 64-65; Doc. 11-2 at 9-10. Under that agreement, Plaintiffs' new principal balance was $146,848.34, with a 4% interest rate, resulting in monthly payments of $613.74 through the new maturity date of November 1, 2057. Doc. 1-1 at ¶¶ 66-67. After executing the modification agreement, Nationstar dismissed the foreclosure suit and the court vacated the default judgment, Doc. 19-1 at ¶¶ 2-3, but not before Plaintiffs retained an attorney and paid expenses in connection with the bankruptcy petition, Doc. 1-1 at ¶¶ 57, 62-63;

Doc. 19-1 at ¶ 4.  Plaintiffs were also assessed attorney fees that their condominium association incurred as a defendant in the foreclosure suit.  Doc. 1-1 at ¶ 58; Doc. 11-2 at 1.

**Discussion**

Plaintiffs bring two state law claims, alleging that: (1) Ocwen breached the Modification Agreement by failing to implement the loan modification contemplated by the Agreement; and (2) Ocwen engaged in unfair practices in violation of the ICFA after they applied for a modification.  Doc. 1-1 at ¶¶ 70-86.  In seeking dismissal, Ocwen argues that the Modification Agreement is not an enforceable contract, that the ICFA claim alleges only breach of contract, and that its conduct did not proximately cause Plaintiffs' alleged injuries.  Doc. 11 at 9-15.  (At the motion hearing, Doc. 23, Ocwen withdrew a preclusion argument based on the foreclosure judgment, Doc. 11 at 5-9, so that argument will not be addressed.)

## I.     Breach of Contract Claim

As noted, Plaintiffs allege that Ocwen breached the Modification Agreement by failing to implement the terms of the Agreement after Saika signed and returned it to Ocwen.  Doc. 1-1 at ¶¶ 70-76.  Under Illinois law, a breach-of-contract plaintiff must allege: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff."  *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015).  Among other arguments that challenge the Modification Agreement's enforceability, Ocwen contends that the Agreement was not a valid and enforceable contract because Shakibai never signed it.  Doc. 11 at 9-11; Doc. 21 at 9.

To allege the existence of an enforceable contract, plaintiffs must allege facts showing a valid offer and acceptance.  *See Pine Top Receivables of Ill., LLC v. Banco de Seguros del Estado*, 867 F.3d 709, 712 (7th Cir. 2017) ("It takes an offer and acceptance to form a contract

… .") (Illinois law).  The court will assume without deciding that the Modification Agreement that Ocwen sent to Plaintiffs constituted a formal offer.  The key question becomes whether Plaintiffs validly accepted that offer.  They did not.

When an offer "state[s] an exclusive mode by which it could be accepted" and the offeree fails to "accept the offer in the exclusive manner it authorized, … no contract [is] formed between the parties." *Golden Dipt Co. v. Sys. Eng'g & Mfg. Co.*, 465 F.2d 215, 217 (7th Cir. 1972) (Illinois law); *see also Estate of Chosnyka v. Meyer*, 585 N.E.2d 204, 206 (Ill. App. 1992) ("[A]n offeree must strictly comply to, or conduct herself consistent with, the terms of the offer, including the mode of acceptance dictated therein."); *LaSalle Nat'l Bank v. Vega*, 520 N.E.2d 1129, 1133 (Ill. App. 1988) ("The language of an offer may moreover govern the mode of acceptance required, and, where an offer requires a written acceptance, no other mode may be used."); Restatement (2d) Contracts § 60 (1981) ("If an offer prescribes the place, time or manner of acceptance[,] its terms in this respect must be complied with in order to create a contract.").  The Modification Agreement required "all persons who signed the Loan Documents [a term defined to include the mortgage agreement and the note] or their authorized representative(s) [to] … sign[] this Agreement, unless a borrower or co-borrower is deceased or the Servicer has waived the requirement in writing."  Doc. 1-1 at p. 19; *see id*. at p. 17 (defining "Loan Documents" as "(1) the Mortgage on the Property, and (2) the Note secured by the Mortgage").  On a signature page, the Agreement provided that "[a]ll individuals on the title (even if not a borrower on the note) must sign this agreement."  *Id*. at p. 22.  The Agreement further provided that Ocwen "will not be obligated or bound to make any modification of the Loan Documents if I [Saika] fail to meet any one of the requirements under this Agreement."  *Id*. at p. 18; *see id*. at p. 17 (defining "I" to mean "Saika").

Shakibai was on the condominium's title and signed the mortgage agreement. *Id*. at ¶¶ 2, 6; Doc. 11-1 at 2, 14. Under the Modification Agreement's plain terms, then, Shakibai was required to sign the Agreement unless he was deceased, an authorized representative signed on his behalf, or Ocwen waived the signature requirement in writing. Doc. 1-1 at p. 19. Yet Plaintiffs do not allege that Shakibai signed the Agreement, nor do they allege that he was deceased, that Ocwen waived the signature requirement in writing, or that Saika was his authorized representative. *Id*. at ¶¶ 2, 26; *see id*. at pp. 21-22 (showing only Saika's signature on the Agreement's signature pages). Because Plaintiffs did not satisfy the Modification Agreement's provisions regarding acceptance, Plaintiffs did not validly accept Ocwen's offer and the Agreement never ripened into an enforceable contract. *See Wigod*, 673 F.3d at 562 (holding that the borrower had to meet all conditions, including signing and returning the modification agreement, for the agreement to be enforceable); *Miranda v. Ocwen Loan Servicing, LLC*, 2017 WL 2634364, at *3 (D.N.J. June 16, 2017) (holding that the borrower failed to properly accept a similarly worded loan modification offer where "the co-borrower Husband still had an interest in the Home, and he did not sign the application or otherwise agree to its terms"); *Bolone v. Wells Fargo Home Mortg., Inc.*, 858 F. Supp. 2d 825, 833 (E.D. Mich. 2012) (noting that a borrower's failure to provide the documentation requested during the TPP justifies denial of the permanent loan modification).

Plaintiffs argue that the mend-the-hold doctrine precludes Ocwen from contending that Shakibai's failure to sign the Modification Agreement renders it non-enforceable. Doc. 19 at 12-13. (As Plaintiffs acknowledged at the motion hearing, Doc. 23, mend-the-hold is their only response to Ocwen's argument that the contract claim should be dismissed on the ground that Shakibai did not sign the Agreement.). Mend-the-hold is "a common law doctrine that limits the

right of a party to a contract suit to change his litigating position." *Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 362 (7th Cir. 1990). "[A] corollary of the duty of good faith" that Illinois implies between contractual parties, mend-the-hold provides that "[a] party who hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries on another defense for size can properly be said to be acting in bad faith." *Id.* at 363. Plaintiffs argue that mend-the-hold prevents Ocwen from using Shakibai's failure to sign the Modification Agreement as a defense because Ocwen's pre-suit rationale for denying the modification—that Fannie Mae's guidelines prevented modification while the loan remained current, Doc. 1-1 at ¶¶ 47-48, 50-51—did not reference Shakibai's failure to sign. Doc. 19 at 12-13. That is, Plaintiffs argue that mend-the-hold limits Ocwen to the contractual defenses that it raised before this litigation began.

The Seventh Circuit's *Harbor Insurance* opinion expressed uncertainty over whether mend-the-hold can lock a party into its prelitigation contract defenses, but noted that "many" cases were "consistent with the view that the doctrine only bars a contract party from changing his position *in litigation*." 922 F.2d at 364. The Seventh Circuit recently cleared up that uncertainty, holding in no uncertain terms that mend-the-hold "does not prohibit the addition of a defense after suit is filed or otherwise limit a defendant to defenses announced before a suit is filed." *On-Site Screening, Inc. v. United States*, 687 F.3d 896, 899 n.2 (7th Cir. 2012); *see also Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 644 (7th Cir. 2017) (similar); *Ryerson Inc. v. Fed. Ins. Co.*, 676 F.3d 610, 614 (7th Cir. 2012) (holding that, "in Illinois, mend the hold does not forbid the defendant to add a defense after being sued; that is, it does not confine him to the defense (or defenses) that he announced *before* the suit," explaining that to "require a potential defendant to commit irrevocably to defenses before he is sued would be

unreasonable to the point of absurdity"). Rather, mend-the-hold stands for the more limited proposition that "a defendant in contract litigation [may not] chang[e] its defenses midstream without any reason for doing so." *Amerisure Ins. Co. v. Nat'l Surety Corp.*, 695 F.3d 632, 636 (7th Cir. 2012) (internal quotation marks omitted). Recent Illinois cases are in accord. *See FHP Tectonics Corp. v. Am. Home Assur. Co.*, 57 N.E.3d 575, 587 (Ill. App. 2016) (noting that mend-the-hold "prevents a defendant in contract litigation from 'chang[ing] its defenses' midstream without any reason for doing so") (quoting *Ryerson*, 676 F.3d at 614); *Israel v. Nat'l Canada Corp.*, 658 N.E.2d 1184, 1191 (Ill. App. 1995) (noting that mend-the-hold "requires a defendant in a breach of contract claim to stand by the first defense raised *after the litigation has begun*" and that "the law does not require that the defense be asserted at the time the contract is terminated") (emphasis added); Robert H. Sitkoff, Comment, *"Mend the Hold" and* Erie*: Why an Obscure Contracts Doctrine Should Control in Federal Diversity Cases*, 65 U. Chi. L. Rev. 1059, 1059 (1998) ("Under the Illinois (minority) version of the rule, absent a good faith justification for a change in position, a defendant in a breach of contract action is confined to the first defense raised *once the litigation is underway*.") (emphasis added).

Plaintiffs respond, Doc. 24, by citing this sentence from *County of Schuyler v. Missouri Bridge & Iron Co.*, 100 N.E. 239 (Ill. 1912): "Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground and put his conduct upon another and different consideration." *Id.* at 241. Plaintiffs take this sentence out of context. Despite its rather broad articulation of the doctrine, *County of Schuyler* applied mend-the-hold only to foreclose a defense that the defendant failed to raise in its pleadings but then tried to assert at trial. *Ibid.* Given the context in which *County of Schuyler* uttered the above-quoted sentence, the Appellate Court of Illinois was right to say eight

decades later that "[t]here is no case law that clearly holds that the [mend-the-hold] doctrine applies [to prevent addition of defenses] at the pleading stage." *Delaney v. Marchon, Inc.*, 627 N.E.2d 244, 249 (Ill. App. 1993). In any event, whatever *County of Schuyler* held over a century ago, the Seventh Circuit has recently and consistently held that the doctrine does not foreclose a defendant from raising a contract defense simply because it did not articulate the defense prior to suit. *See Estate of Burford*, 851 F.3d at 644; *Amerisure Ins. Co.*, 695 F.3d at 636; *On-Site Screening, Inc.*, 687 F.3d at 899 n.2; *Ryerson Inc.*, 676 F.3d at 614. This court is obliged to follow that post-*Schuyler* Seventh Circuit precedent. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) (holding that "district judges must follow the decisions of [the Seventh Circuit] whether or not they agree" with its view of Illinois law).

Accordingly, the mend-the-hold doctrine does not prevent Ocwen from raising a defense not disclosed in prelitigation communications with Plaintiffs. Because Plaintiffs do not present any other ground for holding that the Agreement is enforceable despite Shakibai's failure to sign, their breach of contract claim is dismissed.

## II.    ICFA Claim

As noted, Plaintiffs allege that Ocwen violated the ICFA by engaging in unfair loan servicing practices after they applied for a home mortgage modification. Doc. 1-1 at ¶¶ 77-86. The ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 608 (7th Cir. 2013) (quoting *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002)). The elements of an ICFA claim are: "(1) a deceptive [or unfair] act or practice by the defendant; (2) the defendant's intent that the plaintiff[s] rely on the [deceptive or unfair practice]; (3) the deceptive [or unfair]

act[s] occurred during a course of conduct involving trade or commerce; and (4) actual damage to the plaintiff[s]; (5) proximately caused by the deceptive [or unfair] act[s]." *Phila. Indem. Ins. Co. v. Chi. Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014); *see also Siegel v. Shell Oil Co.*, 612 F.3d 932, 934-35 (7th Cir. 2010) (same). Because Plaintiffs' claim relies on ICFA's unfairness prong, not its deception prong, the claim "need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b)." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011) (same). Ocwen contends that Plaintiffs have failed to properly allege the unfairness and causation elements of their ICFA claim.

## A.     Unfair Conduct

The ICFA claim targets several actions taken by Ocwen during its servicing of Plaintiffs' loan: (1) Ocwen's instructing Plaintiffs to keep the pre-TPP automatic debit in place during and after the TPP, but ultimate refusal to modify the loan because Plaintiffs remained current on their pre-TPP loan payment obligations; (2) Ocwen's delay in notifying Plaintiffs of its denial of their loan modification application; (3) Ocwen's mishandling of Plaintiffs' payments during the HAMP process, *i.e.*, placing payments in a suspense account rather than applying them toward the loan balance; (4) Ocwen's reporting of Plaintiffs' account as delinquent to credit reporting agencies; and (5) Ocwen's failure to implement the Modification Agreement. Doc. 1-1 at ¶¶ 79-84. Even putting aside the fourth and fifth actions and considering only the first three, *see Purcell v. Bank of Am.*, 659 F.3d 622, 625 (7th Cir. 2011) (holding that the Fair Credit Reporting Act, 15 U.S.C. § 1681t(b)(1)(F), preempts state law claims for supplying inaccurate information

to credit reporting agencies); Section I, *supra* (holding that Ocwen did not breach the Modification Agreement), the complaint adequately alleges unfair conduct.

"Unfairness under the ICFA depends on three factors: '(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and/or] (3) whether it causes substantial injury to consumers.'" *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1002 (7th Cir. 2018) (quoting *Robinson*, 775 N.E.2d at 961). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson*, 775 N.E.2d at 961; *see also Newman*, 885 F.3d at 1002 ("A significant showing that any of the three factors is met is enough; so too are facts that, to a lesser degree, satisfy all three."). Determining whether a practice is unfair under the ICFA requires "a case-by-case analysis." *Siegel*, 612 F.3d at 935.

Conduct is immoral, unethical, oppressive, or unscrupulous for ICFA purposes if it "leave[s] the consumer with little choice except to submit to it." *Newman*, 885 F.3d at 1002-03; *see also Robinson*, 775 N.E.2d at 962 (holding that oppression requires a "lack of meaningful choice" for consumers). Oppression occurs, for example, if a consumer is forced to choose between paying a greater amount and losing a previously promised benefit. *See Newman*, 885 F.3d at 1003 (where a consumer had to choose between forfeiting "sunk costs" and paying unexpectedly higher expenses); *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 834 (7th Cir. 2014) (recounting a case where a consumer must choose between losing his investment and obtaining an overpriced product he did not want) (citing *Thompson v. Fajerstein*, 2008 WL 4279983, at *5 (N.D. Ill. Sept. 17, 2008)); *Ekl v. Knecht*, 585 N.E.2d 156, 162-63 (Ill. App. 1991) (where a plumber extracted an additional fee by threatening to undo all the repairs he had

just made); *see also Wendorf v. Landers*, 755 F. Supp. 2d 972, 979 (N.D. Ill. 2010) ("Courts interpreting the meaning of 'unfair practices' have held that a plaintiff states a claim under the ICFA where the defendant's conduct gave plaintiff no reasonable alternative to incurring a charge or penalty.") (citing cases).

Here, while Ocwen initially indicated that it would adjust Plaintiffs' automatic debit to reflect the reduced payments required by the TPP, Doc. 1-1 at ¶ 18; Doc. 19 at 2, it later told them that they needed to keep the preexisting debit in place for the loan modification to proceed, Doc. 1-1 at ¶¶ 29, 40. As a result, Plaintiffs allowed Ocwen to maintain a *biweekly* debit some $58 more than their *monthly* payment obligation under the TPP. *Id*. at ¶¶ 19-20, 27. Confronted with Ocwen's threat that adjusting the debit would imperil their loan modification request, Plaintiffs had this choice: either leave in place the high, pre-TPP biweekly automatic debit and fall further into financial distress, or cancel the debit and forfeit the opportunity to obtain the modification that Ocwen assured them was forthcoming. *Id*. at ¶¶ 18, 30, 38, 40. That Hobson's choice, requiring Plaintiffs to bear surplus payments for months just to remain eligible for the modification they needed, qualifies as oppression under the ICFA. *See Newman*, 885 F.3d at 1003 (finding oppression where each choice presented would force the consumer to lose the benefit of the bargain to which she allegedly was entitled); *Robinson*, 775 N.E.2d at 962 (noting that demands for higher payment, when combined with threats of "dire alternatives," result in oppression by depriving the plaintiffs of "meaningful choice").

Ocwen's insistence that Plaintiffs continue to make those unsustainable payments also violated HAMP guidelines. As noted, a practice may be unfair under the ICFA when it "offends public policy," which can occur where the practice violates statutory or administrative rules establishing a certain standard of conduct. *Robinson*, 775 N.E.2d at 961; *see Newman*, 885 F.3d

at 1002 (finding ICFA unfairness based on violation of a state statute and a state administrative rule); *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 740-41 (7th Cir. 2017) (treating "two provisions of the Illinois Administrative Code" as exemplary of public policy). An unfairness claim may also rest on violations of administrative directives, like HAMP servicing guidelines, that themselves do not permit private enforcement. *See Wigod*, 673 F.3d at 575 (recognizing that a violation of HAMP directives could support an ICFA unfairness claim); *Boyd v. U.S. Bank, N.A.*, 787 F. Supp. 2d 747, 752 (N.D. Ill. 2011) (same).

By offering Plaintiffs a TPP, Doc. 1-1 at ¶ 14, Ocwen necessarily determined from their loan modification application that they were at imminent risk of default and putatively eligible for more favorable loan terms. *See Wigod*, 673 F.3d at 556-57 (explaining that to receive a TPP, a borrower must be "qualified for a HAMP loan modification" and therefore be "in default or … likely soon to be in default"); Fannie Mae, *supra*, at 452, 454 (same). Yet by continuing to debit Plaintiffs the pre-TPP biweekly payment and warning that halting the automatic debit would imperil their loan modification request, Doc. 1-1 at ¶¶ 28-29, 40, Ocwen undermined the TPP's role in the HAMP—providing an affordable bridge between the preexisting and modified loan terms—and violated HAMP directives. *See Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878, 880-81 (9th Cir. 2013) ("The TPP requires borrowers … to make trial payments *of the modified amount* to the servicer.") (emphasis added); *Wigod*, 673 F.3d at 557 (same). Indeed, Fannie Mae's HAMP servicing guidelines mandated that TPP payments be more affordable than the payments that had led the borrower to the brink of foreclosure: "For mortgage loans where the servicer has determined that the borrower's monthly payment is in imminent default, the payment during the [TPP] must be less than the contractual monthly payment in effect prior to the [TPP]." Fannie Mae, *supra*, at 456. Instead, at Ocwen's direction, Plaintiffs paid more than

17

*double* the monthly payments contemplated by the TPP and the Modification Agreement. Doc. 1-1 at ¶¶ 15, 17, 25, 27.

Ocwen made matters worse by telling Plaintiffs that their HAMP modification had been denied *because* they followed its instructions to maintain the pre-TPP biweekly debits and thereby remained current on their pre-TPP payment obligations. Doc. 1-1 at ¶ 47 (alleging that Ocwen explained that because "the account remained current of in good standing during and after the TPP, Ocwen was unable to complete the permanent modification of the account with the investor of the loan … Fannie Mae"). And that denial is suspect even on its own terms, as Fannie Mae's HAMP servicing guidelines allow loan modifications where, as here, an account is current. *See* Fannie Mae, *supra*, at 395, 451 (noting that accounts may be "current" but also in "imminent default"). But rather than notify Plaintiffs that remaining current on their pre-TPP loan payments might jeopardize their eligibility for a modification, Ocwen encouraged the automatic biweekly debits for months after the TPP was complete, stretching Plaintiffs financially while (ironically) weakening their case for a modification. Doc. 1-1 at ¶¶ 19, 27, 30. Additionally, by forcing Plaintiffs to pay more per month than was required under both the TPP and the pre-TPP mortgage, and then declining a modification, Ocwen inflicted substantial injury for ICFA unfairness purposes. *See Newman*, 885 F.3d at 1003 ("Newman also has alleged substantial injury [because] MetLife induced her to pay a premium … at a rate greater than she would otherwise have paid [absent the misrepresentation]."); *Robinson*, 775 N.E.2d at 962 (noting that a consumer "compelled to pay an unreasonable amount … in excess of what she [had] … agreed to pay" suffered "substantial harm" under the ICFA) (describing *Ekl*, 585 N.E.2d at 163).

Given the breadth and depth of their factual allegations, Plaintiffs have pleaded unfair conduct. Ocwen responds that Plaintiffs at most allege breach of contract—specifically, of the Modification Agreement—which is not actionable under the ICFA. Doc. 11 at 12-14.

"A breach of contractual promise, without more, is not actionable under the [ICFA]." *Phila. Indem. Ins. Co.*, 771 F.3d at 402 (quoting *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005)); *see also Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) (holding that the ICFA "is not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy") (internal quotation marks omitted). So, if Plaintiffs alleged only that Ocwen breached the Modification Agreement, without also alleging violations of public policy and oppressive conduct, their ICFA claim would be dismissed—even if they had a viable contract claim. *See Gritters v. Ocwen Loan Servicing, LLC*, 2018 WL 1784134, at *14 (N.D. Ill. Apr. 13, 2018) (dismissing an ICFA claim that "simply restate[d] the alleged breach" of contract); *Golbeck v. Johnson Blumberg & Assocs., LLC*, 2017 WL 3070868, at *13-14 (N.D. Ill. July 19, 2017) (same, where the plaintiff failed to allege that the loan servicer's actions were "oppressive"); *Geske v. Fed. Nat'l Mortg. Ass'n*, 2015 WL 1397087, at *3 (N.D. Ill. Mar. 25, 2015) ("Plaintiffs include no factual allegations that state or indicate that Defendant's failures violated public policy or rose to the level of oppressive or coercive conduct."). But as shown above, Plaintiffs' ICFA claim is amply supported by allegations that Ocwen violated public policy (expressed in HAMP servicing guidelines) and engaged in oppressive conduct in a manner that inflicted substantial injury (forcing Plaintiffs to make excess payments that, ironically, weakened their request for a loan modification). The claim therefore survives dismissal. *See Wigod*, 673 F.3d at 575 (holding that an ICFA claim survived dismissal where the plaintiff alleged that the servicer "dishonestly and ineffectually

implemented HAMP") (internal quotation marks omitted); *Boyd*, 787 F. Supp. 2d at 753-54 (same, where the servicer allegedly "violated HAMP directives" by failing to consider a potentially eligible homeowner for a HAMP modification).

Ocwen invokes the mend-the-hold doctrine in an attempt to prevent Plaintiffs from asserting claims of unfair conduct that they did not raise while Ocwen was their servicer or during Nationstar's foreclosure action. Doc. 21 at 10-11. By failing to present its mend-the-hold argument until its reply brief, Ocwen forfeited the point for purposes of its motion to dismiss. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue.").

## B. Causation

As noted, Plaintiffs also must allege that Ocwen's unfair conduct "proximately cause[d]" their injury, meaning that "'but for' [Ocwen's] unfair conduct, [they] would not have been damaged." *Siegel*, 612 F.3d at 935. Proximate cause in an ICFA case "is typically an issue of fact" unless "only one conclusion is clearly evident." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 334 (7th Cir. 2018) (internal quotations marks omitted).

Plaintiffs adequately allege that Ocwen's conduct proximately caused their injuries. For one, the complaint alleges that Ocwen's representations that Plaintiffs would remain eligible for a HAMP modification only if their pre-TPP automatic debit remained in place caused them to make biweekly payments that exceeded what they should have paid under the TPP and the pre-TPP mortgage loan. *See Siegel*, 612 F.3d at 537 (noting that proximate cause under the ICFA is

present where the defendant's conduct led the plaintiff to make inflated payments). For another, Ocwen's placement of Plaintiffs' payments in a suspense account, Doc. 1-1 at ¶¶ 31, 49-51, which the mortgage agreement did not permit because the payments more than kept the account current, Doc. 11-1 at 5 (indicating that payments could be held in suspense only if the account was not current), along with Ocwen's delayed, confusing, and misleading responses to Plaintiffs' loan modification application, Doc. 1-1 at ¶¶ 37-38, 41-42, 47-51, arguably caused Nationstar's foreclosure action, *id*. at ¶¶ 53-56, and, ultimately, Plaintiffs' entry into less favorable loan modification terms with Nationstar than would have been available earlier from Ocwen, *compare id*. at ¶¶ 23-25 (terms of Ocwen's proposed modification from January 2015), *with id*. at ¶¶ 66-68 (terms of the November 2017 modification executed with Nationstar). *See Wigod*, 673 F.3d at 575 (finding a plausible causal relationship under the ICFA where the loan servicer's improper conduct during the modification process resulted in the homeowner having more limited options to save her home); *Boyd*, 787 F. Supp. 2d at 754 (same, where the violation of HAMP directives led to the borrower's "inability to fairly negotiate a plan to stay in his home") (internal quotation marks and alterations omitted).

Ocwen contends that Plaintiffs broke the chain of causation between its conduct and their injuries by allowing entry of a default judgment in the foreclosure suit and then filing for bankruptcy. Doc. 11 at 15. At best, Ocwen's argument addresses injuries arising *after* the default judgment entered in May 2017; the conduct resulting in that judgment and the subsequent bankruptcy could not have caused injuries that Plaintiffs already had suffered, including months of excess loan payments, runarounds, and delays that at least contributed to the initiation of foreclosure proceedings and Plaintiffs' ultimate entry into modified loan terms less favorable than those that would have been available from Ocwen. *See Camasta v. Jos. A. Bank Clothiers,*

*Inc.*, 761 F.3d 732, 737-38 (7th Cir. 2014) (noting in the ICFA context that conduct occurring after an injury cannot have caused the injury). Nor can Ocwen as a matter of law disclaim responsibility for injuries directly caused by Nationstar but that arguably flowed "in natural or probable sequence" from the position in which Plaintiffs were placed by Ocwen's allegedly unfair conduct. *Benzakry v. Patel*, 77 N.E.3d 1116, 1129 (Ill. App. 2017) (holding that the proximate cause "need not be the sole cause or the last or nearest cause") (quoting *Capccioni v. Brennan Naperville, Inc.*, 791 N.E.2d 553, 562 (Ill. App. 2003)); *see also Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439, 442-43 (7th Cir. 2009) ("The intervention of independent concurrent or intervening forces will not break causal connection if the intervention of such forces was itself probable or foreseeable. What is the proximate cause of an injury is ordinarily a question of fact to be determined … from a consideration of all of the evidence.") (Illinois law).

That said, the court notes that Plaintiffs "cannot obtain relief without *evidence* of injury proximately caused" by Ocwen's conduct. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014). Thus, the court holds only that Plaintiffs are "entitled a chance to prove [their] case," *ibid.*, recognizing that Ocwen may attempt on summary judgment and/or at trial to defeat proximate cause on a developed evidentiary record showing, for example, that intervening events in fact broke the causal chain as to some or all or Plaintiffs' alleged damages. *See Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1153 (7th Cir. 2010) ("[The defendant] will have another opportunity after discovery to raise the proximate cause issue in a motion for summary judgment … at which point [the plaintiff] will have to do more than simply allege proximate cause. Until then, she has done enough to survive a motion to dismiss.").

**Conclusion**

Ocwen's motion to dismiss is granted as to the contract claim and denied as to the ICFA claim. Although the court doubts that repleading could save the contract claim, the dismissal of that claim is without prejudice. *See Pension Trust Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 941 (7th Cir. 2018) ("We repeatedly have said that a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend [the] complaint before the entire action is dismissed.") (internal quotation marks omitted). Plaintiffs have until December 21, 2018 to file an amended complaint. If they do not do so, the dismissal of the contract claim will convert automatically to a dismissal with prejudice. If they file an amended complaint, Ocwen will have until January 14, 2019 to file its response.

December 7, 2018

_____
United States District Judge