UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IZUMI SAIKA and MOHAMMAD SHAKIBAI, | ) | |
| | ) | |
| Plaintiffs, | ) | 18 C 3888 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| PHH MORTGAGE CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Izumi Saika and Mohammad Shakibai, a married couple, filed suit against their mortgage loan servicer, Ocwen Loan Servicing, alleging that it violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. ("ICFA"), and breached the parties' contract. Doc. 1-1. (PHH Mortgage Corporation substituted for Ocwen as defendant, Doc. 98, but the court will continue to refer to Ocwen.) The court dismissed the contract claim but allowed the ICFA claim to proceed. Docs. 29-30 (reported at 357 F. Supp. 3d 704 (N.D. Ill. 2018)). Ocwen moves for summary judgment, Doc. 100, and to strike portions of Plaintiffs' Local Rule 56.1(b)(3)(C) statement of additional facts, Doc. 124. The summary judgment motion is granted and the motion to strike is denied as moot.

**Background**

The court recites the facts as favorably to Plaintiffs as the record and Local Rule 56.1 permit. *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

On December 21, 2007, Saika received from IndyMac Bank a $151,050.00 purchase money mortgage loan owned and guaranteed by the Federal National Mortgage Association ("Fannie Mae"). Doc. 112 at ¶¶ 10, 13. Both Saika and Shakibai signed the mortgage and Saika signed a promissory note. *Id*. at ¶ 10. Repayment was secured by real property co-owned by Plaintiffs. *Id*. at ¶ 11. In the note and deed of trust, Saika agreed to make monthly payments of $954.74 for principal and interest, plus fluctuating monthly payments for escrow items such as real estate taxes and hazard insurance. *Id*. at ¶ 12. Saika also agreed how the payments were to be applied, when a suspense account could be used, and when the loan would be considered in default. *Ibid*.

Because Fannie Mae owned and guaranteed the loan, the loan servicer was obligated to adhere to Fannie Mae guidelines. *Id*. at ¶ 14. The guidelines set forth a loan modification process providing, in pertinent part, that: only a loan that is delinquent or in imminent default is eligible for a Fannie Mae Home Affordable Modification Program ("HAMP") modification; if the loan is in imminent default, the borrower can qualify for a HAMP modification only by adhering to a trial period plan ("TPP") with payments lower than the regular, pre-TPP monthly payments; the loan must be reclassified, which appears to involve moving it from a performing pool to a non-performing pool; the loan must be four months delinquent prior to reclassification; and a borrower has only one opportunity to obtain a HAMP modification. *Id*. at ¶¶ 15, 53.

Ocwen became Plaintiffs' loan servicer on September 1, 2013. *Id*. at ¶ 20. Ocwen's website provided access to an online payment system. *Id*. at ¶¶ 26-29. At the time Ocwen became Plaintiffs' loan servicer, Plaintiffs themselves were not making monthly payments on the loan; rather, government funds were covering the payments because Plaintiffs had been granted

2

relief under the Illinois Hardest Hit Fund, which assists homeowners who experience a 15% reduction in income due to a qualifying event. *Id*. at ¶ 21; Doc. 123 at ¶¶ 3b-c.

The Illinois Hardest Hit Fund payments ended in January 2014. Doc. 112 at ¶ 24. In February 2014, with Ocwen's assistance, Saika set up online automatic withdrawals from her bank account to make her mortgage payments. *Id*. at ¶¶ 24, 30-31. Twice per month, Saika paid half the required monthly payment plus $100, resulting in her paying $200 more per month than what she was required to pay. *Id*. at ¶¶ 31-32. She received some payment confirmation emails. *Id*. at ¶ 33.

In July 2014, Saika requested a modification assistance package, and Ocwen approved her for an unemployment forbearance plan on August 21, 2014. *Id*. at ¶ 34. Plaintiffs contacted Ocwen with questions, and the Ocwen representative encouraged them to apply for a loan modification. *Id*. at ¶ 35. On November 17, 2014, Plaintiffs requested a reduced mortgage interest rate of 4.25%. *Id*. at ¶¶ 36-37. In making that request, Saika represented that the loan payments were unaffordable because the amount she was receiving in unemployment benefits was less than her income while she was employed. *Id*. at ¶ 38.

On December 3, 2014, Ocwen offered Saika a HAMP TPP and told her that she could be eligible for a permanent loan modification if she satisfied the TPP and other conditions. *Id*. at ¶ 41. To accept Ocwen's offer, Saika had to either (i) contact Ocwen by phone or in writing to accept or (ii) submit the first trial plan payment of $627.62. *Id*. at ¶ 42. The TPP contemplated four monthly payments of $627.62—hundreds of dollars less per month than what she had been paying under the terms of the note and deed of trust—and required that Saika "send the exact amount stated on each coupon." *Id*. at ¶¶ 43-44.

Plaintiffs contacted Ocwen on December 12, 2014, but were scheduled for a callback appointment. *Id*. at ¶ 45; Doc. 123 at ¶ 4a. Ocwen received from Plaintiffs an automatic payment in the amount of $690.17, not the $627.62 called for by the TPP, on December 8, 2014. Doc. 112 at ¶ 45. Another automatic payment was submitted that month, in the amount of $685.20, and two $685.20 automatic payments were submitted in January 2015. *Id*. at ¶ 46. Ocwen did not change—or have the third-party payment processor change—the automatic payment amounts to correspond to the lower monthly amount owed under the TPP. Doc. 123 at ¶¶ 6a-b.

On January 26, 2015, Ocwen notified Saika that she was eligible for a permanent loan modification and sent her a Modification Agreement for Plaintiffs to sign. Doc. 112 at ¶ 47. The material included with the Modification Agreement stated that, "[t]o accept this offer, you must sign and return both copies of the Modification Agreement to us before 2/11/2015," and that, "[i]f you do not send both signed copies of the Modification Agreement by the above date, you must contact us if you still wish to be considered for this program and have your loan modified." *Id*. at ¶ 48; Doc. 103-14 at 2 (emphasis omitted). It further stated that, "[i]f the trial period payments are made after their due dates or in amounts different from the amount required, your loan may not be modified." Doc. 112 at ¶ 48 (emphasis omitted); Doc. 103-14 at 2 (emphasis omitted).

Plaintiffs contacted Ocwen in late January 2015 and February 2015 with questions about the Modification Agreement. Doc. 112 at ¶ 48; Doc. 123 at ¶ 8a. During those calls, Plaintiffs never said that they did not want or were rejecting the Modification Agreement. Doc. 123 at ¶ 8b. Plaintiffs found the process difficult and time-consuming, particularly because they often

4

had to set up "call-back" times and be placed on hold, and their relationship manager changed during the process. *Id*. at ¶¶ 9a-e.

Saika (but not Shakibai) signed the Modification Agreement in February 2015 and returned it to Ocwen. Doc. 112 at ¶ 49; Doc. 123 at ¶¶ 10a-b. In signing the Modification Agreement, Saika certified: "I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future," and "I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan." Doc. 112 at ¶ 50 (quoting Doc. 103-15). Ocwen offered the Modification Agreement to Saika even though she was not in default and in fact had made payments higher than what the TPP required, and she was not in default when she made those certifications. *Id*. at ¶ 51.

Plaintiffs' relationship manager with Ocwen told them that it had received all the trial payments and that the trial was completed. *Ibid*. The relationship manager added that once Ocwen received the Modification Agreement, Ocwen would review it to ensure it was correct and, if it was, Ocwen would start completing the modification. *Id*. at ¶ 52; Doc. 123 at ¶ 11a. Shakibai did not sign the Modification Agreement, Doc. 112 at ¶ 52, and avers that he did not know that he needed to, Doc. 123 at ¶ 11c. Although the Modification Agreement by its terms required Shakibai's signature, Ocwen never notified Plaintiffs that it was incomplete. Doc. 112 at ¶ 52. Ocwen's practice when a borrower returned a document without the required signatures was to reach out and ask for the missing signatures. Doc. 123 at ¶ 11b. Shakibai would have signed the Modification Agreement had Ocwen told him to do so. *Id*. at ¶ 11d.

Plaintiffs did not know that their loan had to be reclassified before it could be modified. Doc. 112 at ¶ 53; Doc. 123 at ¶ 19. The loan did not qualify for reclassification because it was

5

not delinquent, as the pre-TPP automatic payment amounts, rather than the amounts required by the TPP, had been made during the trial period. Doc. 112 at ¶ 54. Ocwen had not told Plaintiffs when they started the TPP or during the trial period that they needed to change the amount or frequency of their automatic payments. *Ibid*. Indeed, after Plaintiffs returned the Modification Agreement to Ocwen, the mortgage statements they received from Ocwen continued to instruct them to pay the pre-TPP amount, not a modified amount. Doc. 123 at ¶¶ 12a-b.

In April 2015, Ocwen placed some of Plaintiffs' loan payments into a suspense account in order to make the loan appear delinquent, which in turn would allow it to be reclassified. Doc. 112 at ¶ 55. As a result, the loan appeared delinquent in Ocwen's system and triggered telephone calls and delinquency notices to Plaintiffs. *Id*. at ¶ 57; Doc. 123 at ¶¶ 13-14. The delinquency notices, sent in April 2015, May 2015, and October 2015, did not state that Ocwen had placed some of Plaintiffs' payments in a suspense account. Doc. 123 at ¶ 14. At one point, Ocwen sent Plaintiffs a delinquency notice that included an amount that had not yet come due. *Id*. at ¶ 15b. Ocwen would have sent delinquency notices if Plaintiffs had made the payment amounts required by the TPP, as they then in fact would have been delinquent. Doc. 112 at ¶ 57.

On or around May 9, 2015, Ocwen reported to a credit bureau that Saika owed $4,093 past due on the loan. Doc. 123 at ¶ 16. That report was incorrect, as Plaintiffs were current on their payments. *Id*. at ¶¶ 15a, 16.

In telephone conversations from March 2015 through May 2015, Ocwen told Plaintiffs that their payments were past due. *Id*. at ¶ 13. Ocwen did not tell Plaintiffs why the payments they had made were not being applied to their credit account. Doc. 112 at ¶ 55. Plaintiffs did not know why they were receiving mortgage statements and phone calls informing them that they were delinquent on their payments. *Id*. at ¶ 56. Plaintiffs suffered emotional distress due to

6

their conversations with Ocwen and their receipt of delinquency notices despite having made their full payments. Doc. 123 at ¶ 17.

In May 2015, Plaintiffs sent Ocwen multiple communications complaining about the delinquency notices, seeking information about the status of their loan modification request, and noting that they were current on their payments. Doc. 112 at ¶ 58. Ocwen responded on May 27, 2015 that it had received the signed Modification Agreement and was working with Fannie Mae on reclassifying the loan. *Id*. at ¶ 59; Doc. 123 at ¶ 18. Ocwen at that point told Plaintiffs that it had placed some of their payments into a suspense account. Doc. 123 at ¶ 18. Plaintiffs did not understand what Ocwen meant by reclassification or suspense account. *Id*. at ¶ 19. Ocwen instructed Saika to "continue to remit the scheduled trial payments each month," though a mortgage statement dated May 18, 2015 showed that Plaintiffs owed their pre-TPP monthly payment. Doc. 112 at ¶ 59. Ocwen sent different letters at different times instructing Plaintiffs to pay different amounts. Doc. 123 at ¶ 22.

In June 2015, Ocwen reapplied the funds in the suspense account to Plaintiffs' account. Doc. 112 at ¶ 60. Ocwen did not tell Plaintiffs that doing so would jeopardize Fannie Mae's approval of the loan modification, as the loan would no longer be delinquent. *Ibid*. In late July or August 2015, Ocwen's relationship manager advised Plaintiffs to stop making payments because they should not be current on the loan and told them that Ocwen's credit department had created a "fake delinquency" on their account. Doc. 123 at ¶¶ 23a-b. Plaintiffs then instructed their bank to stop making automatic payments to Ocwen. *Id*. at ¶ 23c.

In August and September 2015, Plaintiffs and Ocwen again communicated about the status of the modification. *Id*. at ¶ 24; Doc. 112 at ¶ 61. Plaintiffs were concerned about the "fake delinquency." Doc. 123 at ¶ 24. Ocwen sent Plaintiffs a letter on August 20, 2015 stating

7

that the interest rate on the loan had been adjusted to 2.0%, but Ocwen in fact did not adjust the interest rate. *Id*. at ¶¶ 25a-b.

On October 13, 2015, Ocwen notified Saika that she was "not eligible for a loan modification" because she "no longer appear[ed] to be in need of a modification," and stated that she had the right to appeal that decision within fourteen days. Doc. 112 at ¶ 62. That day, Ocwen sent Plaintiffs a letter informing them that it was transferring servicing of the loan to Nationstar Mortgage LLC, effective November 1, 2015. *Id*. at ¶¶ 62, 65.

On October 15, 2015, Ocwen placed $10,444.79 of Plaintiffs' payments into a suspense account to again make it appear that they were delinquent so that the loan would qualify for reclassification. *Id*. at ¶ 63; Doc. 123 at ¶ 27. Ocwen never informed Plaintiffs that this was a temporary measure to qualify the loan for reclassification or that re-applying the payments to the credit account from the suspense account would jeopardize approval of the modification. Doc. 112 at ¶ 63. Saika sent a letter dated November 4, 2015, and an email dated November 7, 2015, to appeal the loan modification denial. *Id*. at ¶ 64; Doc. 123 at ¶ 28. Ocwen did not respond. Doc. 123 at ¶ 28. An Ocwen supervisor told Plaintiffs on November 6, 2015 that the modification was denied not because they were unqualified, but because there would not be time to complete the modification before the servicing was transferred to Nationstar. *Id*. at ¶ 29.

Plaintiffs had difficulty making their mortgage payments, even having to borrow money from family to do so. *Id*. at ¶ 32.

The funds placed in the suspense account remained there at the time loan servicing was transferred to Nationstar on November 1, 2015. Doc. 112 at ¶ 66. After repeated inquiries from Plaintiffs, Ocwen emailed Nationstar on November 24, 2015 and December 1, 2015 asking that the suspense account funds be applied toward their mortgage debt. *Id*. at ¶ 67. Nationstar told

8

Ocwen on December 1, 2015 that the suspense account funds had already been applied to the credit account. *Id*. at ¶ 68. Plaintiffs continued to send written communications to Ocwen, which continued to respond. *Id*. at ¶ 70. In a December 4, 2015 letter, Ocwen told Plaintiffs that because Fannie Mae required that the loan be delinquent to qualify for modification, Ocwen had moved some of their payments to a suspense account. Doc. 123 at ¶ 30.

After servicing was transferred to Nationstar, Plaintiffs asked both Nationstar and Ocwen to honor and implement the Modification Agreement. *Id*. at ¶¶ 33a-b. Nationstar told Plaintiffs to reapply for a loan modification and offered them two TPPs in April 2016. *Id*. at ¶¶ 34, 35a-b; Doc. 112 at ¶¶ 73-74. In June 2016, Nationstar told Plaintiffs that it would implement their Modification Agreement with Ocwen, so Plaintiffs did not complete their TPP payments. Doc. 112 at ¶ 75; Doc. 123 at ¶ 36. Nationstar later told Plaintiffs that it would not implement their Modification Agreement with Ocwen, and that because Plaintiffs had not completed their payments under the Nationstar TPPs, the TPPs were denied. Doc. 112 at ¶ 75; Doc. 123 at ¶ 36.

Nationstar filed a judicial foreclosure suit on October 5, 2016. Doc. 112 at ¶ 76. Saika was in Japan caring for her parents at the time. Doc. 123 at ¶¶ 37a-c. Nationstar obtained a default judgment against Saika on May 2, 2017, and scheduled a foreclosure sale for August 2017. Doc. 112 at ¶ 77. On August 1, 2017, Saika filed for Chapter 13 bankruptcy, which stopped the sale. *Id*. at ¶ 78. Plaintiffs received a loan modification from Nationstar, effective November 1, 2017, with an unpaid principal balance of $146,848.34 and a fixed interest rate of 4%. *Id*. at ¶ 79; Doc. 123 at ¶ 38.

## Discussion

The ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and

9

deceptive business practices." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 608 (7th Cir. 2013) (quoting *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002)). The ICFA prohibits both "unfair" and "deceptive" acts or practices, 815 ILCS 505/2; *see Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011), but Plaintiffs' claim relies solely on the unfairness prong. The elements of an ICFA claim are: "(1) a deceptive [or unfair] act or practice by the defendant; (2) the defendant intended that the plaintiff[s] rely on the [deceptive or unfair acts]; (3) the deceptive [or unfair] act[s] occurred in a course of conduct involving trade or commerce; and (4) actual damage to the plaintiff[s]; (5) proximately caused by the deceptive [or unfair] act[s]." *Phila. Indem. Ins. Co. v. Chi. Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014). Ocwen moves for summary judgment on the ground, among others, that a reasonable jury could not find that Plaintiffs suffered "[a]ctual damages caused by" its conduct. Doc. 101 at 20-22.

To meet the "actual damage" element of their claim, Plaintiffs must adduce evidence that they "suffered actual pecuniary loss." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018); *see also Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010). In addition, Plaintiffs must show that Ocwen's conduct was the proximate cause of that pecuniary loss. *See Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). That is, Plaintiffs "must … show that [they] suffered substantial [pecuniary] injury, and that [they] could not avoid this injury," *ibid.*, and "must set forth sufficient evidence creating a genuine issue of material fact that 'but for' the defendant['s] unfair conduct, [they] would not have been damaged," *id*. at 935.

To determine whether Plaintiffs have met their burden, the court starts by identifying Ocwen's purportedly unfair conduct. Plaintiffs submit that Ocwen acted unfairly when it did not change, or have the third-party payment processor change, the amounts of their automatic

10

payments to correspond to the lower monthly amount they owed under the TPP, when it failed to advise them to change the amount of their automatic payments, when it failed to advise them that Shakibai needed to sign the Modification Agreement, and when it failed to bill them the lower, modified payment amount after Saika returned the incomplete Modification Agreement. Doc. 111 at 19. But to avoid Ocwen's statute of limitations defense, Doc. 101 at 12-13, Plaintiffs simultaneously assert that "Ocwen's unfair conduct began when [it] started sending Plaintiffs past due statements when [they] were current on payments," which they peg as no earlier than April 21, 2015. Doc. 111 at 24. This poses an insurmountable timing problem, as Ocwen offered the TPP to Plaintiffs in December 2014, Plaintiffs made TPP payments in December 2014 and January 2015, the Modification Agreement process commenced in January 2015, and Saika returned the Modification Agreement to Ocwen in February 2015. Plaintiffs therefore cannot predicate their ICFA claim on Ocwen's conduct during the TPP and with respect to Shakibai's signature, as that conduct occurred before April 21, 2015.

Plaintiffs also attempt to predicate their ICFA claim on Ocwen's billing them for their original, pre-TPP payments after April 20, 2015. Doc. 111 at 9. But Plaintiffs did not accept the Modification Agreement, 357 F. Supp. 3d at 711-14, so their original, pre-TPP amount remained due at that juncture under the note and deed of trust. It follows that the ICFA claim cannot rest on that conduct. *See Golbeck v. Johnson Blumberg & Assocs., LLC*, 2017 WL 3070868, at *13 (N.D. Ill. July 19, 2017) ("Plaintiff fails to show that [the defendant servicer's] decision to collect on and enforce the terms of his mortgage 'offends public policy,' was 'immoral, unethical, oppressive, or unscrupulous,' or 'causes substantial injury to consumers.'").

Finally, Plaintiffs attempt to predicate their ICFA claim on Ocwen's creation of "a fake delinquency" by moving certain payments into a suspense account and the past due statements

11

that it sent when they were actually current on the loan. Doc. 111 at 18-21. That conduct occurred during the pertinent time period, after April 20, 2015. And Plaintiffs maintain that this conduct qualifies as unfair under the ICFA because it violated a consent judgment between Ocwen, the Consumer Financial Protection Bureau, and state attorneys general that required Ocwen "to provide borrower adequate information on billing statements" and "remediate inaccuracies in borrowers' account information." *Id*. at 18. Assuming the conduct qualifies as unfair under the ICFA, the next question is whether the conduct caused Plaintiffs the kind of damage that the ICFA remedies.

Plaintiffs identify a variety of harms that they believe arose from that conduct. The first set of harms are the distress, confusion, and time burdens caused by the delinquency notices and suspense account. *Id*. at 20-21. Those harms do not give rise to actual pecuniary loss, and thus cannot predicate Plaintiffs' ICFA claim. *See Morris v. Harvey Cycle & Camper, Inc.*, 911 N.E.2d 1049, 1053 (Ill. App. 2009) (affirming dismissal of an ICFA claim where the plaintiff "alleged only emotional damages," not "actual damages in the form of specific economic injuries"); *Gagnon v. JPMorgan Chase Bank, N.A.*, 563 B.R. 835, 848 (N.D. Ill. 2017) ("[E]motional damages do not constitute actual damages under the ICFA.") (internal quotation marks omitted).

The second set of harms Plaintiffs identify are: (1) their inability to make the lower payments that would have been owed under a HAMP modification; (2) their losing the opportunity for a HAMP modification and its associated financial incentives; (3) their nearly losing their home to foreclosure; and (4) their entry into loan repayment terms with Nationstar less favorable than those they would have received under the HAMP modification with Ocwen. Doc. 111 at 21-23. Although those harms are pecuniary, Ocwen submits that because Plaintiffs'

assertion of those harms rests on the premise that they were entitled to a HAMP modification, and because they in fact were not eligible for a modification when the conduct in question occurred, Plaintiffs cannot show that Ocwen's conduct proximately caused their harms. Doc. 101 at 20-21; Doc. 122 at 8, 14-17.

Ocwen is correct. As Ocwen observes, Doc. 122 at 14-15, even had it not created a "fake delinquency" or sent incorrect past due notices, Plaintiffs still would have suffered those pecuniary harms because they would have remained ineligible for the HAMP modification given that they had not properly made the TPP payments and were still current on their loan. Thus, although that unfair conduct caused non-pecuniary harms, Doc. 111 at 20, it did not proximately cause the pecuniary harms that arose from Plaintiffs' not receiving the HAMP modification. And Plaintiffs do not explain how their risk of foreclosure would have been lower or their loan terms with Nationstar would have improved absent Ocwen's unfair conduct; nor could they so explain, as by December 2015 Nationstar had applied to Plaintiffs' credit account the funds that Ocwen had moved to the suspense account in creating the "fake delinquency," but Nationstar did not initiate the foreclosure action until October 2016. Accordingly, because Plaintiffs cannot establish a causal relationship between Ocwen's unfair conduct and their pecuniary harms, the ICFA claim fails. *See McGann v. PNC Bank, Nat'l Ass'n*, 2015 WL 5050155, at \*7-8 (N.D. Ill. Aug. 25, 2015) (granting summary judgment to the defendant where the plaintiff was not eligible for a HAMP modification, which meant that the defendant's allegedly unfair conduct regarding the modification "could not have caused the foreclosure").

## Conclusion

Although Ocwen's treatment of Plaintiffs fell far short in many respects, and although Ocwen would richly deserve having to defend its actions before a jury, its summary judgment

motion is granted because Plaintiffs cannot establish a causal relationship between their pecuniary harms and Ocwen's unfair conduct. Ocwen's motion to strike is denied as moot because it is entitled to summary judgment even if the court considers the materials that it seeks to strike. Judgment will be entered for Ocwen and against Plaintiffs.

August 14, 2020

_____
United States District Judge